1    Theodore J. Boutrous, Jr., SBN 132099
     tboutrous@gibsondunn.com
2    Andrea E. Neuman, SBN 149733
     aneuman@gibsondunn.com
3    William E. Thomson, SBN 187912
     wthomson@gibsondunn.com
4    Ethan D. Dettmer, SBN 196046
     edettmer@gibsondunn.com
5    Joshua S. Lipshutz, SBN 242557
     jlipshutz@gibsondunn.com
6    GIBSON, DUNN & CRUTCHER LLP
   333 South Grand Avenue
7    Los Angeles, CA 90071
   Telephone:     213.229.7000
8    Facsimile:      213.229.7520

9    Herbert J. Stern (*pro hac vice* app. forthcoming)
     hstern@sgklaw.com
10   Joel M. Silverstein (*pro hac vice* app. forthcoming)
     jsilverstein@sgklaw.com
11   STERN & KILCULLEN, LLC
   325 Columbia Turnpike, Suite 110
12   P.O. Box 992
   Florham Park, NJ 07932-0992
13   Telephone: 973.535.1900
   Facsimile: 973.535.9664

14

15   Attorneys for Defendants CHEVRON
   CORPORATION and CHEVRON U.S.A., INC

Neal S. Manne, SBN 94101
   nmanne@susmangodfrey.com
Johnny W. Carter (*pro hac vice* app. forthcoming)
   jcarter@susmangodfrey.com
Erica Harris (*pro hac vice* app. forthcoming)
   eharris@susmangodfrey.com
Steven Shepard (*pro hac vice* app. forthcoming)
   sshepard@susmangodfrey.com
SUSMAN GODFREY LLP
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone:    713.651.9366
Facsimile:     713.654.6666

16
17

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

18
19
20
21
22
23
24
25
26
27
28

THE CITY OF RICHMOND, a municipal corporation, individually and on behalf of THE PEOPLE OF THE STATE OF CALIFORNIA,

        Plaintiff,

       v.

CHEVRON CORP.; CHEVRON U.S.A., INC.; EXXONMOBIL CORP.; BP P.L.C.; BP AMERICA, INC.; ROYAL DUTCH SHELL PLC; SHELL OIL PRODUCTS COMPANY LLC; CITGO PETROLEUM CORP.; CONOCOPHILLIPS; CONOCOPHILLIPS COMPANY; PHILLIPS 66; TOTAL E&P USA INC.; TOTAL SPECIALTIES USA INC.; ENI S.p.A.; ENI OIL & GAS INC.; ANADARKO PETROLEUM CORP.; OCCIDENTAL PETROLEUM CORP.; OCCIDENTAL CHEMICAL CORP.; REPSOL S.A.; REPSOL ENERGY NORTH

CASE NO. _____

**NOTICE OF REMOVAL BY DEFENDANTS CHEVRON CORPORATION AND CHEVRON U.S.A., INC.**

[Removal from the Superior Court of the State of California, County of Contra Costa, Case No. MSC18-00055]

Action Filed:    January 22, 2018

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

AMERICA CORP.; REPSOL TRADING USA
CORP.; MARATHON OIL COMPANY;
MARATHON OIL CORPORATION;
MARATHON PETROLEUM CORP.; HESS
CORP.; DEVON ENERGY CORP.; DEVON
ENERGY PRODUCTION COMPANY, L.P.;
ENCANA CORP.; APACHE CORP.; and
DOES 1 through 100, inclusive,

Defendants.

Gibson, Dunn &
Crutcher LLP

NOTICE OF REMOVAL

**TO THE CLERK OF THE ABOVE-TITLED COURT AND TO PLAINTIFF THE CITY OF RICHMOND AND ITS COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT Defendants Chevron Corp. and Chevron U.S.A., Inc. (collectively, "the Chevron Parties"), remove this action—with reservation of all defenses and rights—from the Superior Court of the State of California for the County of Contra Costa, Case No. MSC18-00055, to the United States District Court for the Northern District of California pursuant to 28 U.S.C. §§ 1331, 1334, 1441(a), 1442, 1452, and 1367(a), and 43 U.S.C. § 1349(b).  No Defendants, including the Chevron Parties, have been joined or served (properly or otherwise) in this action, and therefore consent of any Defendant to the filing of this Notice of Removal is not required.[1]

This Court has original federal question jurisdiction under 28 U.S.C. § 1331, because the Complaint arises under federal laws and treaties, and presents substantial federal questions as well as claims that are completely preempted by federal law.  This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over any claims over which it does not have original federal question jurisdiction because they form part of the same case or controversy as those claims over which the Court has original jurisdiction.  As set forth below, removal is proper pursuant to 28 U.S.C. §§ 1441, 1442, 1446, and 1452, and 43 U.S.C. § 1349(b).

In addition, the Complaint is legally without merit, and, at the appropriate time, Defendants will move to dismiss Plaintiff's claims pursuant to Rule 12 of the Federal Rules of Civil Procedure.

Through its Complaint, the City of Richmond calls into question longstanding decisions by the Federal Government regarding, among other things, national security, national energy policy, environmental protection, development of outer continental shelf lands, the maintenance of a national petroleum reserve, mineral extraction on federal lands (which has produced billions of dollars for the Federal Government), and the negotiation of international agreements bearing on the development and use of fossil fuels.  Many of the Defendants have contracts with the Federal Government to develop and extract minerals from federal lands and to sell fuel and associated products to the Federal Government for the Nation's defense.  The gravamen of the Complaint seeks either to undo all of

---

[1] Removal prior to service is proper.  *See, e.g.*, *City of Ann Arbor Employees' Ret. Sys. v. Gecht*, No. C-06-7453EMC, 2007 WL 760568, at *8 (N.D. Cal. Mar. 9, 2007).

those Federal Government policies or to extract "compensation" and force Defendants to relinquish the profits they obtained by having contracted with the Federal Government or relied upon national policies to develop fossil fuel resources.

In the Complaint's view, a state court, on petition by a city, may regulate the nationwide—and indeed, worldwide—economic activity of key sectors of the American economy, those that supply the fuels that power production and innovation, keep the lights on, and that form the basic materials from which innumerable consumer, technological, and medical devices are themselves fashioned. Though nominally asserted under state law, the Complaint puts at issue long-established federal statutory, regulatory, and constitutional issues and frameworks, and it seeks to hold a small number of oil and gas companies—who themselves are responsible for a mere fraction of global greenhouse gas emissions—liable for the alleged effects of *global* warming, including sea level rise, droughts, and extreme precipitation caused by greenhouse gas emissions from countless nonparties.

This case is about *global* emissions. Plaintiffs allege that the worldwide use of fossil fuels "plays a direct and substantial role in the unprecedented rise in emissions of greenhouse gas pollution," which "is the main driver of the gravely dangerous changes occurring to the global climate." Compl. ¶¶ 2. Importantly, however, Plaintiffs' claims are not limited to harms caused by fossil fuels extracted, sold, marketed, or used in California. Instead, their claims depend on Defendants' nationwide and global activities, as well as the activities of billions of fossil fuel consumers, including not only entities such as the U.S. government and military, but also hospitals, schools, manufacturing facilities, and individual households.

This lawsuit implicates bedrock federal-state divisions of responsibility, and appropriates to itself the direction of such federal spheres as nationwide economic development, international relations, and America's national security. Reflecting the substantial and uniquely federal interests posed by greenhouse gas claims like these, the Supreme Court and the Ninth Circuit have recognized that causes of action of the types asserted here are governed by federal common law, *not* state law.

The Complaint has no basis in law and is inconsistent with serious attempts to address important issues of national and international policy. Accordingly, Plaintiff's Complaint should be heard in this federal forum to protect the national interest by its prompt dismissal.

## I.    TIMELINESS OF REMOVAL

1.    Plaintiff, the City of Richmond, filed a Complaint against the Chevron Parties and other named Defendants in the Superior Court for Contra Costa County, California, Case No. MSC18-00055, on January 22, 2018.  A copy of all process, pleadings, or orders in the possession of the Chevron Parties is attached as Exhibit A to the Declaration of William E. Thomson, filed concurrently herewith.

2.    This notice of removal is timely under 28 U.S.C. § 1446(b) because it is filed fewer than 30 days after service.  28 U.S.C. § 1446(b).  No Defendants have been served (properly or otherwise) as of this date and therefore consent is not required for this removal.  *See* Thomson Decl. ¶ 4. In addition, consent to this removal petition is not required as removal does not proceed "solely under 28 U.S.C. § 1441."  28 U.S.C. § 1446(b)(2)(A); *see also, e.g.*, 28 U.S.C. § 1452.[2]

## II.    SUMMARY OF ALLEGATIONS AND GROUNDS FOR REMOVAL

3.    Plaintiff is the City of Richmond, California.  Plaintiff brings claims against Defendants for alleged injuries relating to climate change, including damages and injunctive relief from injuries suffered from "global warming" and other "changes occurring to the global climate" including, sea level rise, storms, heatwaves, drought, extreme precipitation, and other natural phenomena.  *See, e.g.*, Compl. ¶¶ 2, 8.  Plaintiff asserts the following claims on behalf of itself:  public nuisance; private nuisance; strict liability for failure to warn; strict liability for design defect; negligence; negligence for failure to warn; and trespass.  Plaintiff also purports to assert a public nuisance claim on behalf of the People of the State of California.  In addition to compensatory and punitive damages, Plaintiff seeks the "equitable disgorgement of all profits Defendants obtained" through their business of manufacturing, producing, and/or promoting the sale of fossil fuel products (Compl. ¶ 227), as

---

[2]  In filing or consenting to this Notice of Removal, Defendants do not waive, and expressly preserve any right, defense, affirmative defense, or objection, including, without limitation, personal jurisdiction, insufficient process, and/or insufficient service of process.  A number of Defendants contend that personal jurisdiction in California is lacking over them, and these Defendants will move to dismiss for lack of personal jurisdiction at the appropriate time.  *See, e.g.*, *Carter v. Bldg. Material & Const. Teamsters' Union Local 216*, 928 F. Supp. 997, 1000–01 (N.D. Cal. 1996) ("A petition for removal affects only the forum in which the action will be heard; it does not affect personal jurisdiction.").

well as "equitable relief, including abatement of the nuisances complained of" in the Complaint (Compl., Prayer for Relief).

4.      Multiple Defendants will deny any California court has personal jurisdiction, and those Defendants properly before the Court will deny any liability as to Plaintiff's individual claims and as to the claim brought on behalf of the People of California.  Defendants expressly reserve all rights in this regard.  For purposes of meeting the jurisdictional requirements for removal only, how-ever, Defendants submit that removal is proper on at least seven independent and alternative grounds.

5.      *First*, the action is removable under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 be-cause Plaintiff's claims, to the extent that such claims exist, implicate uniquely federal interests and are governed by federal common law, and not state common law.  *See Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 847, 850 (1985).  The Ninth Circuit has held that comparable claims, in which a municipality alleged that the defendants' greenhouse gas emissions led to global warming-related injuries such as coastal erosion, were governed by federal common law.  *See Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 855 (9th Cir. 2012) ("*Kivalina*").  Federal common law applies only in those few areas of the law that so implicate "uniquely federal interests" that application of state law is affirmatively inappropriate.  *See, e.g.*, *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504, 507 (1988); *Am. Elec. Power Co., Inc. v. Connecticut*, 564 U.S. 410, 424 (2011) ("*AEP*") ("borrowing the law of a particular State would be inappropriate").  As a result, the Ninth Circuit's determination in *Kivalina* that federal common law applies to comparable claims of global warming-related tort claims necessarily means that state law should not apply to those types of claims.  Plaintiff's claims, therefore, (to the extent they exist at all) arise under federal common law, not state law, and are properly removed to this Court.

6.      *Second*, removal is authorized under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 be-cause the action necessarily raises disputed and substantial federal questions that a federal forum may entertain without disturbing a congressionally approved balance of responsibilities between the fed-eral and state judiciaries.  *See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005).  In fact, the causes of action as alleged in the Complaint attack federal policy decisions and threaten to upset longstanding federal-state relations, second-guess policy decisions made by

Congress and the Executive Branch, and skew divisions of responsibility set forth in federal statutes and the United States Constitution.

7.      ***Third***, removal is authorized under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 because Plaintiff's claims are completely preempted by the Clean Air Act and/or other federal statutes and the United States Constitution, which provide an exclusive federal remedy for plaintiffs seeking stricter regulations regarding the nationwide and worldwide greenhouse gas emissions put at issue in the Complaint.

8.      ***Fourth***, this Court has original jurisdiction over this lawsuit and removal is proper pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), because this action "aris[es] out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, or the subsoil or seabed of the outer Continental Shelf, or which involves rights to such minerals."  43 U.S.C. § 1349(b); *see also Tenn. Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996).

9.      ***Fifth***, Defendants are authorized to remove this action under 28 U.S.C. § 1442(a)(1) because, assuming the truth of Plaintiff's allegations, a causal nexus exists between their actions, taken pursuant to a federal officer's directions, and Plaintiff's claims; they are "persons" within the meaning of the statute; and can assert several colorable federal defenses.  *See Leite v. Crane Co.*, 749 F.3d 1117 (9th Cir. 2014).

10.     ***Sixth***, removal is authorized under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 because Plaintiff's claims are based on alleged injuries to and/or conduct on federal enclaves.  As such, Plaintiff's claims arise under federal-question jurisdiction and are removable to this Court.  *See* U.S. Const., art. I, § 8, cl. 17; *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) ("Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'").

11.     ***Seventh and finally***, removal is authorized under 28 U.S.C. § 1452(a) and 28 U.S.C. § 1334(b) because Plaintiff's state-law claims are related to cases under Title 11 of the United States Code.  Plaintiff alleges that Defendants (improperly defined by Plaintiff to include the conduct of Defendants' subsidiaries, *see, e.g.*, Compl ¶¶ 23(d), 235, 248) engaged in conduct constituting a public

1   nuisance over many decades.  Because Plaintiff's claim is predicated on historical activities of De-

2   fendants, including predecessor companies and companies that they may have acquired or with which

3   they may have merged, and because there are hundreds, if not thousands, of non-joined necessary and

4   indispensable parties, there are many other Title 11 cases that may be related.  *See PDG Arcos, LLC*

5   *v. Adams*, 436 F. App'x 739 (9th Cir. 2011).

6         12.     For the convenience of the Court and all parties, Defendants will address each of these

7   grounds in additional detail.  Should Plaintiff challenge this Court's jurisdiction, Defendants will fur-

8   ther elaborate on these grounds and will not be limited to the specific articulations in this Notice.

9   **III.     THIS COURT HAS FEDERAL-QUESTION JURISDICTION BECAUSE**

10           **PLAINTIFF'S CLAIMS ARISE, IF AT ALL, UNDER FEDERAL COMMON LAW**

11         13.     This action is removable because Plaintiff's claims, to the extent that such claims ex-

12   ist, necessarily are governed by federal common law, and not state common law.  28 U.S.C. § 1331

13   grants federal courts original jurisdiction over "'claims founded upon federal common law as well as

14   those of a statutory origin.'"  *Nat'l Farmers Union*, 471 U.S. at 850 (quoting *Illinois v. City of Mil-*

15   *waukee*, 406 U.S. 91, 100 (1972) ("*Milwaukee I*")).  As the Ninth Circuit explained in holding that

16   similar claims for injuries caused by global warming were governed by federal common law, even

17   "[p]ost-*Erie*, federal common law includes the general subject of environmental law and specifically

18   includes ambient or interstate air or water pollution."  *Kivalina*, 696 F.3d at 855.  As Plaintiff's

19   claims arise under federal common law, this Court has federal-question jurisdiction and removal is

20   proper.

21         14.     Though "[t]here is no federal *general* common law," *Erie R. Co. v. Tompkins*, 304

22   U.S. 64, 78 (1938) (emphasis added), federal common law continues to exist, and to govern, in a few

23   subject areas in which there are "uniquely federal interests," *Boyle*, 487 U.S. at 504.  *See generally*

24   Henry J. Friendly, *In Praise of* Erie—*and the New Federal Common Law*, 39 N.Y.U. L. Rev. 383

25   (1964).  Such uniquely federal interests will require the application of federal common law where, for

26   example, the issue is one that by its nature, is "'within national legislative power'" and there is "a

27   demonstrated need for a federal rule of decision" with respect to that issue.  *AEP*, 564 U.S. at 421 (ci-

28   tation omitted).  Federal common law therefore applies, in the post-*Erie* era, in those discrete areas in

Gibson, Dunn & Crutcher LLP

which application of state law would be inappropriate and would contravene federal interests. *Boyle*, 487 U.S. at 504–07. The decision that federal common law applies to a particular issue thus inherently reflects a determination that state law does *not* apply. *Nat'l Audubon Soc'y v. Dep't of Water*, 869 F.2d 1196, 1204 (9th Cir. 1988); *see also City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 312 n.7 (1981) ("*Milwaukee II*") ("[I]f federal common law exists, it is because state law cannot be used.").

15.     In *Kivalina*, the Ninth Circuit, quoting the Supreme Court's decision in *AEP*, reiterated that federal common law applies to "'subjects within the national legislative power where Congress has so directed or where the basic scheme of the Constitution so demands.'" 696 F.3d at 855 (quoting *AEP*, 564 U.S. at 421) (further citation and internal quotation marks omitted). Although Congress thus sometimes affirmatively directs the application of federal common law, the *Kivalina* court noted that, "[m]ore often, federal common law develops when courts must consider *federal* questions that are not answered by statutes." *Id.* (emphasis added). Given that claims asserting injuries from global warming have an intrinsic interstate and transnational character, the Ninth Circuit held that such claims inherently raise federal questions and fall within the settled rule that federal common law governs "the general subject of environmental law and specifically includes ambient or interstate air and water pollution." *Id.* at 855; *see also id.* ("federal common law can apply to transboundary pollution suits" such as the plaintiff's); *AEP*, 564 U.S. at 421 ("Environmental protection is undoubtedly an area within national legislative power, [and] one in which federal courts may fill in statutory interstices."). Thus, while the Ninth Circuit had previously expressed skepticism that federal common law, as opposed to state law, would govern a localized claim for air pollution arising from a specific source within a single state, *see Nat'l Audubon Soc'y*, 869 F.2d at 1203–04, the court in *Kivalina* found that claims arising from injuries allegedly caused by *global* warming implicate interstate and, indeed, international aspects that inherently invoke uniquely federal interests and responsibilities. *See Kivalina*, 696 F.3d at 856–57; *see also Massachusetts v. EPA*, 549 U.S. 497, 498 (2007) ("The sovereign prerogatives to force reductions in greenhouse gas emissions, to negotiate emissions treaties with developing countries, and (in some circumstances) to exercise the police power to reduce motor-vehicle emissions are now lodged in the Federal Government."); *United*

*States v. Solvents Recovery Serv.*, 496 F. Supp. 1127, 1134 (D. Conn. 1980) (describing Supreme Court jurisprudence recognizing "the strong federal interest in controlling certain types of pollution and protecting the environment").

16.     Although *Kivalina* did not expressly address the viability of the plaintiff's purported alternative common law claims resting on state law (which the district court dismissed without prejudice), the *Kivalina* court's finding that federal common law applied to the municipality's global warming claims means that state law *cannot* be applied to such claims.  The conclusion that federal common law governs an issue rests, not on a discretionary choice between federal law and state law, but on a determination that the issue is so distinctively federal in nature that application of state law to the issue would risk impairing uniquely federal interests.  *Boyle*, 487 U.S. at 506–07; *see also, e.g.*, *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159–60 (9th Cir. 2016) (liability of defense contractor to third party under government contract for weapons systems implicated "uniquely federal interests" in national security that would be impaired if disparate state-law rules were applied); *Nat'l Audubon Soc'y*, 869 F.3d at 1204 ("[I]t is inconsistent to argue 'that both federal and state nuisance law apply to this case.  If state law can be applied, there is no need for federal common law; if federal common law exists, *it is because state law cannot be used.*'") (emphasis added).

17.     Accordingly, the Ninth Circuit's holding in *Kivalina* that federal common law governs global warming-related tort claims such as Plaintiff's here necessarily means that state law cannot govern such claims.  Although Plaintiff purports to style its nuisance and other common law claims as arising under state law, the question of whether a particular common law claim is controlled by federal common law rather than state law is itself a question of law that is governed by federal law as set forth in *Erie* and its progeny.  While Plaintiff contends that its claims arise under California law, the question of which state, if any, may apply its law to address global climate-change issues is a question that is itself a matter of federal law, given the paramount federal interest in avoiding conflicts of law in connection with ambient air and water.  Moreover, the law is well settled that, in determining whether a case arises under federal law and is properly removable, the Plaintiff's proffered position on a question of law is not entitled to any deference but is instead subject to independent and

*de novo* review by the court.  *See, e.g.*, *United States v. California*, 932 F.2d 1346, 1349 (9th Cir. 1991) ("The issue of whether state or federal [common] law governs is a question of law and is reviewable de novo.");  *Flagstaff Med. Ctr., Inc. v. Sullivan*, 962 F.2d 879, 884, 889–91 (9th Cir. 1992) (same); *see also Provincial Gov't of Marinduque v. Placer Dome, Inc.*, 582 F.3d 1083, 1086–87 (9th Cir. 2009) (applying de novo review to removal based on federal common law).

18.     The extent to which the global warming-related tort claims in this case and in *Kivalina* would impair uniquely federal interests is confirmed by comparing these inherently interstate and transnational claims to the more localized pollution claims that the Ninth Circuit in *National Audubon* held were governed by state law.  In *National Audubon*, the claims at issue involved a challenge to the Los Angeles Department of Water and Power's diversion of "four freshwater streams that would otherwise flow into Mono Lake."  869 F.2d at 1198.  This discrete conduct in California allegedly exposed part of Mono Lake's lake bed, increased the lake's "salinity and ion concentration," and led to "air pollution in the form of alkali dust storms from the newly exposed lake bed."  *Id.* at 1198–99.  The Ninth Circuit held that the allegation that some of the dust reached Nevada was not enough to show that the case involved the sort of "interstate dispute previously recognized as requiring resolution under federal law," such that it was "'inappropriate for state law to control.'"  *Id.* at 1204.  Given their essentially localized nature, the claims involved only a "domestic dispute" that did not fit within the interstate paradigms that the Supreme Court had to that point recognized as properly governed by federal common law.  *Id.* at 1205; *cf. Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 497–98 (1987) (holding that New York law applied to pollution claims arising from discharges from a lakeside New York business, even though those effluents flowed to Vermont side of the lake and caused injury there).

19.     In light of the federal nature of the issues raised by global warming, as described in *AEP* and in *Massachusetts v. EPA*, the *Kivalina* court correctly reached a different conclusion with respect to global warming-related tort claims such as those presented here.  Because (as Plaintiff concedes, Compl. ¶ 103) global warming occurs only as the result of the undifferentiated accumulated emissions of all emitters in the world over an extended period of time, any judgment as to the reasonableness of particular emissions, or as to their causal contribution to the overall phenomenon of

global warming, inherently requires an evaluation at an interstate and, indeed, transnational level. Thus, even assuming that state tort law may properly address local source emissions within that specific state, the imposition of tort liability for allegedly unreasonably contributing to *global* warming would require an over-arching consideration of *all* of the emissions traceable to sales of Defendants' products in each of the states, and, in fact, in the more than 180 nations of the world.  Given the Federal Government's exclusive authority over foreign affairs and foreign commerce, and its preeminent authority over interstate commerce, tort claims concerning global warming directly implicate uniquely federal interests, and a patchwork of 50 state's common law rules cannot properly be applied to such claims without impairing those interests.  Indeed, the Supreme Court expressly held in *AEP* that in cases like this, "borrowing the law of a particular State would be inappropriate." 564 U.S. at 422.  Such global warming-related tort claims, to the extent they exist, are therefore governed by federal common law.  *Kivalina*, 696 F.3d at 855–56.

20.     Under the principles set forth above, Plaintiff's claims are governed by federal common law.  The gravamen of Plaintiff's claims is that "production and use of Defendants' fossil fuel products plays a direct and substantial role in emissions of greenhouse gas pollution" which "is the main driver of the gravely dangerous changes occurring to the global climate." Compl. ¶ 2; *see, e.g.*, *id.* ¶¶ 56–57, 61, 104, 106–110, 211, 236, 248, 282, 289.  Plaintiff's Complaint alleges that Defendants are responsible for "approximately one in every five tons of carbon dioxide and methane emitted worldwide," *id.* ¶ 21, and that "greenhouse gas pollution is the dominant factor in each of the independent causes of [global] sea level rise," *id.* ¶ 61; *see also id.* ¶ 106–110, and other natural phenomena, such as drought, extreme precipitation, and heatwaves, *id.* ¶¶ 82, 173, 196–99, 206–08, 211(b), 213, 214, 225, 248(a), 259, 271(c), 278, 289.  As is evident from the term "global warming" itself, both the causes and the injuries Plaintiff identifies are not constrained to particular sources, cities, counties, or even states, but rather implicate inherently national and international interests, including treaty obligations and federal and international regulatory schemes.  *See id.* ¶ 3 n.5 (describing other sources of emissions); ¶ 7 (only "17.5%" of $CO_2$ emissions allegedly caused by Defendants); ¶ 106 ($CO_2$ emissions cause "*global* sea level rise") (emphasis added); *see, e.g.*, *Massachusetts*, 549 U.S. at 509, 523–24 (describing Senate rejection of the Kyoto Protocol because emissions-reduction targets

did not apply to "heavily polluting nations such as China and India," and EPA's determination that predicted magnitude of future Chinese and Indian emissions "offset any marginal domestic decrease"); *AEP*, 564 U.S. at 427–29 (describing regulatory scheme of the Clean Air Act and role of the EPA); *see also* The White House, Statement by President Trump on the Paris Climate Accord (June 1, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/06/01/statement-president-trump-paris-climate-accord (announcing United States withdrawal from Paris Climate Accord based on financial burdens, energy restrictions, and failure to impose proportionate restrictions on Chinese emissions).

21.     Indeed, the Complaint itself demonstrates that the unbounded nature of greenhouse gas emissions, diversity of sources, and magnitude of the attendant consequences have catalyzed myriad federal and international efforts to understand and address such emissions. *See, e.g.*, Compl. ¶ 148.  The paramount federal interest in addressing the worldwide effect of greenhouse gas emissions is manifested in the regulatory scheme set forth in the Clean Air Act as construed in *Massachusetts v. EPA*.  *See AEP*, 564 U.S. at 427–29.  Federal legislation regarding greenhouse gas emissions reflects the understanding that "[t]he appropriate amount of regulation in any particular greenhouse gas-producing sector cannot be prescribed in a vacuum:  as with other questions of national or international policy, informed assessment of competing interests is required.  Along with the environmental benefit potentially achievable, our Nation's energy needs and the possibility of economic disruption must weigh in the balance." *Id.* at 427.  As a "question[] of national or international policy," the question of how to address greenhouse gas emissions that underlies the requested relief at the heart of Plaintiff's claims implicates inherently federal concerns and is therefore governed by federal common law.  *See id.*; *see also Milwaukee II*, 451 U.S. at 312 n.7 ("[I]f federal common law exists, it is because state law cannot be used.").  Because common law claims that rest on injuries allegedly caused by global warming implicate uniquely federal interests, such claims (to the extent they exist at all) must necessarily be governed by federal common law.  This Court therefore has original jurisdiction over this action.

1    **IV.    THE ACTION IS REMOVABLE BECAUSE IT RAISES DISPUTED AND**
2            **SUBSTANTIAL FEDERAL ISSUES.**

3            22.    "Except as otherwise expressly provided by Act of Congress, any civil action brought
4    in a State court of which the district courts of the United States have original jurisdiction, may be re-
5    moved . . . to the district court of the United States for the district and division embracing the place
6    where such action is pending."  28 U.S.C. § 1441(a).  Federal district courts, in turn, "have original
7    jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."
8    28 U.S.C. § 1331.  The Supreme Court has held that suits apparently alleging only state-law causes of
9    action nevertheless "arise under" federal law if the "state-law claim[s] necessarily raise a stated fed-
10   eral issue, actually disputed and substantial, which a federal forum may entertain without disturbing
11   any congressionally approved balance of federal and state judicial responsibilities."  *Grable*, 545 U.S.
12   at 314.  Applying this test "calls for a common-sense accommodation of judgment to the kaleido-
13   scopic situations that present a federal issue."  *Id.* at 313.

14           23.    Plaintiff's Complaint attempts to undermine and supplant federal regulation of green-
15   house gas emissions and hold a national industry responsible for the alleged consequences of rising
16   ocean levels and hydrologic cycle disruptions such as drought, extreme precipitation, heatwaves, and
17   wildfires that are allegedly caused by global climate change.  There is no question that Plaintiff's
18   claims raise a "federal issue, actually disputed and substantial," for which federal jurisdiction would
19   not upset "any congressionally approved balance of federal and state judicial responsibilities."

20           24.    The issues of greenhouse gas emissions, global warming, hydrologic cycle disruption,
21   and sea level rising are not unique to the City of Richmond, the State of California, or even the
22   United States.  Yet what the Complaint attempts to do is to supplant decades of national energy, eco-
23   nomic development, and federal environmental protection and regulatory policies by prompting a
24   California state court to take control over an entire industry and its interstate commercial activities,
25   and impose massive damages contrary to the federal regulatory scheme.

26           25.    Collectively as well as individually, Plaintiff's causes of action depend on the resolu-
27   tion of disputed and substantial federal questions in light of complex national considerations.  For ex-
28   ample, the Complaint's first, second, and fifth causes of action all seek relief for an alleged nuisance.

Indeed, "the scope and limitations of a complex federal regulatory framework are at stake in this case.  And disposition of whether that framework may give rise to state law claims as an initial matter will ultimately have implications for the federal docket one way or the other."  *Bd. of Comm'rs of Se. La. Flood Protection Auth. v. Tenn. Gas Pipeline Co*, 850 F.3d 714, 723 (5th Cir. 2017) (cert. petition pending) ("*Flood Protection Authority*").

26.     Under federal law, federal agencies must "assess both the costs and benefits of [an] intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs."  Executive Order 12866, 58 Fed. Reg. 190.  Under California law, were it to apply, nuisance claims require a plaintiff to prove that the defendant's conduct is "unreasonable":  in other words, "the gravity of the harm [must] outweigh[] the social utility of the defendant's conduct."  *San Diego Gas & Elec. Co. v. Superior Ct.*, 13 Cal. 4th 893, 938 (1996).  Plaintiff alleges that Defendants, through their national and, indeed, global activities, "have created, contributed to, and assisted in creating, conditions in the City of Richmond, and permitted those conditions to persist, which constitute a nuisance by, *inter alia*, increasing local sea level, and associated flooding, inundation, erosion, and other impacts within the City; increasing the frequency and magnitude of drought in the City; increasing the frequency and magnitude of extreme heat days in the City; and increasing the frequency and magnitude of extreme precipitation events in the City."  Compl. ¶ 210; *see also id.* ¶¶ 223, 259.  Plaintiff alleges that "[t]he seriousness of rising sea levels, higher sea level, more frequent and extreme drought, more frequent and extreme precipitation events, more frequent and extreme heat waves, and the associated consequences of those physical and environmental changes, is extremely grave, and outweighs the social utility of Defendants' conduct."  *Id.* ¶¶ 214, 225, 263.  Plaintiff's product liability claims require a similar risk-utility balancing.  *See Barker v. Lull Eng'g Co., Inc.*, 20 Cal. 3d 413, 427 (1978).

27.     But Congress has directed a number of federal agencies to regulate Defendants' conduct, and in doing so to conduct the same analysis of benefits and impacts that Plaintiff would have the state court undertake in analyzing Plaintiff's claims.  And federal agencies have performed these

Gibson, Dunn & Crutcher LLP

cost-benefit analyses.  *See, e.g.*, Final Carbon Pollution Standards for New, Modified and Recon-structed Power Plants, 80 Fed. Reg. at 64683–84 (EPA considering the impacts of "wildfire" and "ex-treme precipitation events," such as "droughts, floods, hurricanes, and major storms").  The benefits and harms of Defendants' conduct are broadly distributed throughout the Nation, to all residents as well as all state and government entities.  Given this diffuse and broad impact, Congress has acted through a variety of federal statutes—primarily but not exclusively, the Clean Air Act—to strike the balance between energy extraction and production and environmental protections.  *See* Clean Air Act, 42 U.S.C. § 7401(c) (Congressional statement that the goal of the Clean Air Act is "to encourage or otherwise promote reasonable Federal, State, and local governmental actions . . . for pollution preven-tion"); *see also, e.g.*, Energy Reorganization Act of 1974, 42 U.S.C. § 5801 (Congressional purpose to "develop, and increase the efficiency and reliability of use of, all energy sources" while "restoring, protecting, and enhancing environmental quality"); Mining and Minerals Policy Act, 30 U.S.C. § 1201 (Congressional purpose to encourage "economic development of domestic mineral resources" balanced with "environmental needs"); Surface Mining Control and Reclamation Act, 30 U.S.C. § 1201 (Congressional findings that coal mining operations are "essential to the national interest" but must be balanced by "cooperative effort[s] . . . to prevent or mitigate adverse environmental effects").

   28. The question of whether the federal agencies charged by Congress to balance energy and environmental needs for the entire Nation have struck that balance in an appropriate way is "in-herently federal in character" and gives rise to federal question jurisdiction.  *Buckman Co. v. Plain-tiffs' Legal Comm.*, 531 U.S. 341, 347(2001); *see also Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009) (affirming federal question jurisdiction where claims implicated federal agency's acts implementing federal law); *Bennett v. Southwest Airlines Co.*, 484 F.3d 907, 909 (7th Cir. 2007) (federal removal under *Grable* appropriate where claims were "a collateral attack on the validity of" agency action under a highly reticulated regulatory scheme).  Ad-judicating these claims in federal court, including whether private rights of action are even cogniza-ble, is appropriate because the relief sought by Plaintiff would necessarily alter the regulatory regime designed by Congress, impacting residents of the Nation far outside the state court's jurisdiction.  *See, e.g.*, *Grable*, 545 U.S. at 312 (claims that turn on substantial federal questions "justify resort to

the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues");

*West Virginia ex rel. McGraw v. Eli Lilly & Co.*, 476 F. Supp. 2d 230, 234 (E.D.N.Y. 2007) (removal under *Grable* is appropriate where state common law claims implicate "an intricate federal regulatory scheme . . . requiring some degree of national uniformity in interpretation").

29.     The Complaint also calls into question Federal Government decisions to contract with defendants for the extraction, development, and sale of fossil fuel resources on federal lands.  Such national policy decisions have expanded fossil fuel production and use, and produced billions of dollars in revenue to the federal treasury.  Available, affordable energy is fundamental to economic growth and prosperity generally, as well as to national security and other issues that have long been the domain of the Federal Government.  Yet, Plaintiff's claims require a determination that the complained-of conduct—the lawful activity of placing fossil fuels into the stream of interstate and foreign commerce—is unreasonable, and that determination raises a policy question that, under the Constitution and the applicable statutes, treaties, and regulations, is a federal question.  *See In re Nat'l Sec. Agency Telecommc'ns*, 483 F. Supp. 2d 934, 943 (N.D. Cal. 2007) (holding that removal jurisdiction existed over case that implicated state-secrets privilege because "the privilege is 'not only a contested federal issue, but a substantial one,' for which there is 'a serious federal interest in claiming the advantages thought to be inherent in a federal forum'" (quoting *Grable*, 545 U.S. at 313)).  The cost-benefit analysis required by the claims asserted in the Complaint would thus necessarily entail a usurpation by the state court of the federal regulatory structure of an essential, national industry.  "The validity of [Plaintiff's] claims would require that conduct subject to an extensive federal permitting scheme is in fact subject to implicit restraints that are created by state law." *Flood Control Authority*, 850 F.3d at 724; *see also Bader Farms, Inc. v. Monsanto Co.*, No. 16-cv-299, 2017 WL 633815, at *3 (E.D. Mo. Feb. 16, 2017) ("Count VII is in a way a collateral attack on the validity of APHIS's decision to deregulate the new seeds"); *Bennett*, 484 F.3d at 909 (holding that federal removal is proper under *Grable* "when the state proceeding amounted to a collateral attack on a federal agency's action").  Indeed, the "inevitable result of such suits," if successful, is that Defendants "would have to change [their] methods of doing business and controlling pollution to avoid the threat of ongoing liability." *Ouellette*, 479 U.S. at 495.

30.     Plaintiff's claims also necessarily implicate substantial federal questions by seeking to hold Defendants liable for compensatory and punitive damages, as well as injunctive relief, based on allegations that Defendants have waged a "campaign to obscure the science of climate change" and "disseminat[ed] and funded the dissemination of information intended to mislead elected officials and regulators," which Plaintiff alleges defrauded and interfered with federal decision-making, thereby "delay[ing] efforts to curb these emissions."  Compl. ¶ 182; *see also id.* ¶¶ 245–55, 268–95.

31.     To show causation, Plaintiff must establish that federal regulators were misled *and* would have adopted different energy and climate policies absent the alleged misrepresentations. Such a liability determination would require a court to construe federal regulatory decision-making standards, and determine how federal regulators would have applied those standards under counter-factual circumstances.  *See id.* ¶ 164 (arguing that GCC "on behalf of Defendants" sought to "pre-vent[] U.S. adoption of the Kyoto Protocol"); *see also Flood Protection Authority*, 850 F.3d at 723 (finding necessary and disputed federal issue in plaintiffs' state-law tort claims because they could not "be resolved without a determination whether multiple federal statutes create a duty of care that does not otherwise exist under state law").

32.     Plaintiff's Complaint, which seeks to hold Defendants liable for "punitive and exem-plary damages" and requests "equitable disgorgement of *all profits* Defendants obtained" through their business of manufacturing, producing, and/or promoting the sale of fossil fuel products, (*e.g.*, Compl. ¶ 294)—despite Defendants' uncontested compliance with state and federal law—necessarily implicates numerous other disputed and substantial federal issues.  Beyond the strictly jurisdictional character of the points addressed above and herein, it is notable that this litigation places at issue mul-tiple significant federal issues, including but not limited to:  (1) whether Defendants can be held lia-ble consistent with the First Amendment for purportedly "championing . . . anti-regulation and anti-science campaigns" that Plaintiff alleges deceived federal agencies (*id*. ¶ 10); (2) whether a state court may hold Defendants liable for conduct that was global in scale (production of fossil fuels), that allegedly produced effects that are global in scale (increased $CO_2$ levels and rising sea levels), and on that basis, order Defendants to modify their conduct on a global scale (abating rising sea levels), con-sistent with the constitutional principles limiting the jurisdictional and geographic reach of state law

Gibson, Dunn &
Crutcher LLP

16

and guaranteeing due process; (3) whether fossil fuel *producers* may be held liable, consistent with

the Due Process Clause, for climate change when it is the combustion of fossil fuels—including by

Plaintiff and the People of the State of California themselves—that leads to the release of greenhouse

gases into the atmosphere; (4) whether a state may impose liability under state common law when the

Supreme Court has held that the very same *federal* common law claims are displaced by federal stat-

ute, and notwithstanding the commonsense principle that "[i]f a federal common law cause of action

has been extinguished by Congressional displacement, it would be incongruous to allow it to be re-

vived *in any form*," *Kivalina*, 696 F.3d at 857 (emphasis added); (5) whether a state court may regu-

late and burden on a global scale the sale and use of what federal policy has deemed an essential re-

source, consistent with the United States Constitution's Commerce Clause and foreign affairs doc-

trine, as well as other constitutional principles; (6) whether a state court may review and assess the

validity of acts of foreign states in enacting and enforcing their own regulatory frameworks; and

(7) whether a state court may determine the ability to sue based on alleged damages to land, such as

coastal property and interstate highways (*see* Compl. ¶¶ 212, 214, 225), which depends on the inter-

pretation of federal laws relating to the ownership and control of property.

33.    Plaintiff's Complaint also raises substantial federal issues because the asserted claims

intrude upon both foreign policy and carefully balanced regulatory considerations at the national

level, including the foreign affairs doctrine.  Plaintiff seeks to govern extraterritorial conduct and en-

croach on the foreign policy prerogative of the Federal Government's executive branch as to climate

change treaties.  "There is, of course, no question that at some point an exercise of state power that

touches on foreign relations must yield to the National Government's policy, given the 'concern for

uniformity in this country's dealings with foreign nations' that animated the Constitution's allocation

of the foreign relations power to the National Government in the first place."  *Am. Ins. Assoc. v. Gar-

amendi*, 539 U.S. 396, 413 (2003).  Yet, this is the precise nature of Plaintiff's action brought in state

court.  *See United States v. Belmont*, 301 U.S. 324, 331 (1937) ("The external powers of the United

States are to be exercised without regard to state laws or policies… [I]n respect of our foreign rela-

tions generally, state lines disappear."); *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941) ("Our system of

government . . . requires that federal power in the field affecting foreign relations be left entirely free

from local interference.").  Indeed, Plaintiffs complaint takes issue with multiple federal decisions, threatening to upend the federal government's longstanding energy and environmental policies and "compromis[ing] the very capacity of the President to speak for the Nation with one voice in dealing with other governments" on the issue of climate change.  *Garamendi*, 539 U.S. at 424.

34.    Through its action, Plaintiff seeks to regulate greenhouse gas emissions worldwide, far beyond the borders of the United States.  This is premised in part, according to Plaintiff, on Defendants' purported campaign to undermine national and international efforts, like the Kyoto Protocol, to rein in greenhouse gas emissions.  Compl. ¶¶ 150, 164.  Plaintiff alleges that its injuries are caused by global weather phenomena, such as increases in the Earth's ambient temperatures, ocean temperature, sea level, and extreme storm events, and that Defendants are a substantial contributing factor to such climate change as a result of their collective operations on a worldwide basis, which Plaintiff claims accounts for one-fifth of total global greenhouse gas emissions.  *Id.* ¶¶ 21, 196–97.  But "[n]o State can rewrite our foreign policy to conform to its own domestic policies.  Power over external affairs is not shared by the States; it is vested in the national government exclusively.  It need not be so exercised as to conform to State laws or State policies, whether they be expressed in constitutions, statutes, or judicial decrees." *United States v. Pink*, 315 U.S. 203, 233–34 (1942).  States have no authority to impose remedial schemes or regulations to address what are matters of foreign affairs.  *Ginergy v. City of Glendale*, 831 F.3d 1222, 1228–29 (9th Cir. 2016) ("It is well established that the federal government holds the exclusive authority to administer foreign affairs.").  Yet Plaintiff's Complaint seeks to replace international negotiations and Congressional and Executive decisions with their own preferred foreign policy, using the ill-suited tools of California common law and private litigation.  Even when *states* (as opposed to the *City* of Richmond here) have made similar efforts, enacting laws seeking to supplant or supplement foreign policy, the Supreme Court has held that state law can play no such role.  *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 375–81 (2000); *Garamendi*, 539 U.S. at 420–24.

Gibson, Dunn &
Crutcher LLP

NOTICE OF REMOVAL

1   **V.      THE ACTION IS REMOVABLE BECAUSE IT IS COMPLETELY PREEMPTED BY**

2   **FEDERAL LAW**

3          35.     This Court also has original jurisdiction over this lawsuit because Plaintiff requests

4   relief that would alter or amend the rules regarding nationwide—and even worldwide—regulation of

5   greenhouse gas emissions.  This action is completely preempted by federal law.

6          36.     The Supreme Court has held that a federal court will have jurisdiction over an action

7   alleging only state-law claims where "the extraordinary pre-emptive power [of federal law] converts

8   an ordinary state common law complaint into one stating a federal claim for purposes of the well-

9   pleaded complaint rule."  *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987).

10         37.     For the reasons set forth above, litigating in state court the inherently transnational ac-

11  tivity challenged by these complaints would inevitably intrude on the foreign affairs power of the fed-

12  eral government and is completely preempted.  *See Garamendi*, 539 U.S. at 418 ("[S]tate action with

13  more than incidental effect on foreign affairs is preempted, even absent any affirmative federal activ-

14  ity in the subject area of the state [action], and hence without any showing of conflict."); *see also*

15  *California v. Gen. Motors Corp.,* 2007 WL 2726871,*14 (N.D. Cal. Sept. 17, 2007) (dismissing

16  claims against automakers because the federal government "ha[s] made foreign policy determinations

17  regarding the United States' role in the international concern about global warming," and a "global

18  warming nuisance tort would have an inextricable effect on . . . foreign policy").

19         38.     In addition, Plaintiff's claims are preempted by the Clean Air Act.  A state cause of

20  action is preempted under this "complete preemption" doctrine where a federal statutory scheme

21  "provide[s] the exclusive cause of action for the claim asserted and also set[s] forth procedures and

22  remedies governing that cause of action."  *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003).

23  It also requires a determination that the state-law cause of action falls within the scope of the federal

24  cause of action, including where it "duplicates, supplements, or supplants" that cause of action.

25  *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004).

26         39.     Both requirements for complete preemption are present here.  Among other things,

27  Plaintiff's Complaint seeks an "abatement" of a nuisance it alleges Defendants have caused—namely,

28

Gibson, Dunn &
Crutcher LLP

19

a rise in sea levels, an increase in the frequency and intensity of flooding, and an increase in the intensity and frequency of storms and storm-related damages.  As such, it seeks regulation of greenhouse gas emissions far beyond the borders of California and even the borders of the United States.  This can be accomplished only by a nationwide and global reduction in the emission of greenhouse gases.  Even assuming that such relief can be ordered against Defendants for their production and sale of fossil fuels, which are then combusted by others at a rate Plaintiff claims causes the alleged injuries, this claim must be decided in federal court because Congress has created a cause of action by which a party can seek the creation or modification of nationwide emission standards by petitioning the EPA.  That federal cause of action was designed to provide the exclusive means by which a party can seek nationwide emission regulations.  Because Plaintiff's state causes of action would "duplicate[], supplement[], or supplant[]" that exclusive federal cause of action, they are completely preempted.  "If a federal common law cause of action has been extinguished by Congressional displacement, it would be incongruous to allow it to be revived in any form."  *Kivalina*, 696 F.3d at 857.

A.    **The Clean Air Act Provides the Exclusive Cause of Action for Challenging EPA Rulemakings.**

40.    The Clean Air Act permits private parties, as well as state and municipal governments, to challenge EPA rulemakings (or the absence of such) and to petition the EPA to undertake new rulemakings.  *See*, *e.g.*, 5 U.S.C. § 553(e); 42 U.S.C. §§ 7604, 7607.

41.    The Clean Air Act provides the exclusive cause of action for regulation of nationwide emissions.  The Act establishes a system by which federal and state resources are deployed to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."  42 U.S.C. § 7401(b)(1).  At the heart of this system are the emission standards set by EPA.  Specific Clean Air Act provisions authorize or require emission standards to be set if certain findings are made, and such standards must comport with the statutory criteria set by Congress, consistent with the dual goals of the Act.  Under the Clean Air Act, "emissions have been extensively regulated nationwide."  *N.C. ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 298 (4th Cir. 2010).  Regulation of greenhouse gas emissions, including carbon dioxide, is governed by the Clean Air Act, *see Massachusetts*, 549 U.S. at 528–29, and EPA has regulated

these emissions under the Act, *see, e.g.*, 40 C.F.R. §§ 51.166(b)(1)(i), 52.21(b)(1)(i) (regulation of greenhouse gases through the Act's prevention of significant deterioration of air quality permitting program); 77 Fed. Reg. 62,624 (Oct. 15, 2012) (regulation of greenhouse gas emissions from light-duty motor vehicles); 81 Fed. Reg. 73,478 (Oct. 25, 2016) (regulation of greenhouse gas emissions from medium- and heavy-duty engines and motor vehicles).

42.     Congress manifested a clear intent that judicial review of Clean Air Act matters must take place in federal court.  42 U.S.C. § 7607(b).

43.     This congressionally provided statutory and regulatory scheme is thus the "exclusive" means for seeking the nationwide regulation of greenhouse gas emissions and "set[s] forth procedures and remedies" for that relief, *Beneficial Nat'l Bank*, 539 U.S. at 8, irrespective of the savings clauses applicable to some other types of claims.  At least one federal court has observed that the Clean Air Act preempts such state common law nuisance cases because "[i]f courts across the nation were to use the vagaries of public nuisance doctrine to overturn the carefully enacted rules governing air-borne emissions, it would be increasingly difficult for anyone to determine what standards govern.  Energy policy cannot be set, and the environment cannot prosper, in this way."  *N.C. ex rel. Cooper*, 615 F.3d at 298.

**B.     Plaintiff's Asserted State-Law Causes of Action Duplicate, Supplement, and/or Supplant the Federal Cause of Action.**

44.     Plaintiff asks the Court to order Defendants to "abate the nuisance caused by sea level rise and changes to the hydrologic regime, including, but not limited to, increased frequency and magnitude of drought, increased frequency and magnitude of extreme precipitation events, increased frequency and magnitude of heatwaves, and the consequences of those physical and environmental changes in the City's jurisdiction."  Compl. ¶ 13; *see also id.*, Prayer for Relief (requesting "[e]quitable relief, including abatement of the nuisances complained of herein").

45.     According to Plaintiff's own allegations, the alleged nuisances can be abated only by a global—or at the very least national—reduction in greenhouse gas emissions.  *See* Compl. ¶¶ 103 ("[I]t is not possible to determine the source of any particular individual molecule of $CO_2$ in the atmosphere attributable to anthropogenic sources because such greenhouse gas molecules do not bear

Gibson, Dunn & Crutcher LLP

21

markers that permit tracing them to their source, and because greenhouse gases quickly diffuse and comingle in the atmosphere."); *id.* ¶ 104 (describing "global" greenhouse gas emissions relating to fossil fuel products). Indeed, Plaintiff's allegations purport to show that Defendants "undertook a momentous effort to evade *international* and *national* regulation of greenhouse gas emissions"—*not* state or local regulations. *Id.* ¶ 172 (emphases added); *see also id.* ¶ 150 ("Defendants embarked on a decades-long campaign designed to . . . undermine national and international efforts like the Kyoto Protocol to rein in greenhouse gas emissions."); *id.* ¶ 148 (acknowledging, *inter alia*, federal legislative efforts to regulate $CO_2$ and other greenhouse gases that allegedly "prompted Defendants to change their tactics . . . to a public campaign aimed at evading regulation"); *id.* ¶¶ 161, 162(a), 164, (describing alleged efforts to encourage the United States to reject the international Kyoto Protocol).

46.    Plaintiff's state-law tort claims are effectively an end-run around a petition for a rule-making regarding greenhouse gas emissions because they seek to regulate nationwide emissions that Plaintiff concedes conform to EPA's emission standards. *See, e.g.*, *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 539 (1992). The claims would require precisely the cost-benefit analysis of emissions that the EPA is charged with undertaking and would directly interfere with the EPA's determinations. *See supra* ¶¶ 26–27. Because Congress has established a clear and detailed process by which a party can petition the EPA to establish nationwide emissions standards, Plaintiff's claims are completely preempted by the Clean Air Act.

47.    Because Congress has provided an exclusive statutory remedy for the regulation of greenhouse gas emissions which provides federal procedures and remedies for that cause of action, and because Plaintiff's claims fall within the scope of the federal cause of action, Plaintiff's claims are completely preempted by federal law and this Court has federal-question jurisdiction.

## VI.    THE ACTION IS REMOVABLE UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

48.    This Court also has original jurisdiction pursuant to the Outer Continental Shelf Lands Act ("OCSLA"). 43 U.S.C. § 1349(b); *see Tenn. Gas Pipeline*, 87 F.3d at 155. This action "aris[es]

Gibson, Dunn & Crutcher LLP

22

out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, or the subsoil or seabed of the outer Continental Shelf, or which involves rights to such minerals." 43 U.S.C. § 1349(b); *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014) ("th[e] language [of § 1349(b)(1)] [i]s straightforward and broad"). The outer continental shelf ("OCS") includes all submerged lands that belong to the United States but are not part of any State. 43 U.S.C. §§ 1301, 1331.

49.   The breadth of federal jurisdiction granted by OCSLA reflects the Act's "expansive substantive reach." *See EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994). "OCSLA was passed . . . to establish federal ownership and control over the mineral wealth of the OCS and to provide for the development of those natural resources." *Id.* at 566. "[T]he efficient exploitation of the minerals of the OCS . . . was . . . a primary purpose for OCSLA." *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988). Indeed, OCSLA declares it "to be the policy of the United States that … the outer Continental Shelf … should be made available for expeditious and orderly development." 43 U.S.C. § 1332(3). It further provides that "since exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States … such States, and through such States, affected local governments, are entitled to an opportunity to participate, *to the extent consistent with the national interest*, in the policy and planning decisions made by the Federal Government relating to exploration for, and development and production of, minerals of the outer Continental Shelf." *Id.* § 1332(4) (emphasis added).

50.   When enacting Section 1349(b)(1), "Congress intended for the judicial power of the United States to be extended to the entire range of legal disputes that it knew would arise relating to resource development on the [OCS]." *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1228 (5th Cir. 1985). Consistent with Congress' intent, courts repeatedly have found OCSLA

jurisdiction where resolution of the dispute foreseeably could affect the efficient exploitation of minerals from the OCS.[3]  *See, e.g.*, *EP Operating*, 26 F.3d at 569–70; *United Offshore v. S. Deepwater Pipeline*, 899 F.2d 405, 407 (5th Cir. 1990).

51.     OCSLA jurisdiction exists even if the Complaint pleads no substantive OCSLA claims.  *See, e.g.*, *In re Deepwater Horizon*, 745 F.3d at 163.  The Court, moreover, may look beyond the facts alleged in the Complaint to determine that OCSLA jurisdiction exists.  *See, e.g.*, *Plains Gas Solutions, LLC v. Tenn. Gas Pipeline Co., LLC*, 46 F. Supp. 3d 701, 703 (S.D. Tex. 2014); *St. Joe Co. v. Transocean Offshore Deepwater Drilling Inc.*, 774 F. Supp. 2d 596, 2011 A.M.C. 2624, 2640 (D. Del. 2011) (citing *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1205 (5th Cir. 1998)).

52.     Under OCSLA, the Department of Interior administers an extensive federal leasing program aiming to develop and exploit the oil and gas resources of the federal Continental Shelf. 43 U.S.C. § 1334 *et seq.*  Pursuant to this authority, the Interior Department "administers more than 5,000 active oil and gas leases on nearly 27 million OCS acres.  In FY 2015, production from these leases generated $4.4 billion in leasing revenue . . . . [and] provided more than 550 million barrels of oil and 1.35 trillion cubic feet of natural gas, accounting for about sixteen percent of the Nation's oil production and about five percent of domestic natural gas production."  Statement of Abigail Ross Hopper, Director, Bureau of Ocean Energy Management, Before the House Committee on Natural Resources (Mar. 2, 2016), *available at* https://www.boem.gov/FY2017-Budget-Testimony-03-01-2016.  Certain Defendants here, of course, participate very substantially in the federal OCS leasing program.  For example, from 1947 to 1995, Chevron U.S.A. Inc. produced 1.9 billion barrels of crude oil and 11 billion barrels of natural gas from the federal outer continental shelf in the Gulf of Mexico alone.  U.S. Dep't of Int., Minerals Mgmt. Serv., Gulf of Mex. Region, Prod. by Operator Ranked by

---

[3]   As stated in 43 U.S.C. § 1333(a)(1): "The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed . . . for the purpose of exploring for, developing, or producing resources therefrom . . . to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State . . . ."

1    Vol. (1947–1995), *available at* https://www.data.boem.gov/Produc-

2    tion/Files/Rank%20File%20Gas%201947%-20-%201995.pdf.  In 2016, Chevron U.S.A. produced

3    over 49 million barrels of crude oil and 50 million barrels of natural gas from the outer continental

4    shelf on the Gulf of Mexico.  U.S. Dep't of Int., Bureau of Safety & Envtl. Enf't, Gulf of Mex. Re-

5    gion, Prod. by Operator Ranked by Vol. (2016), *available at* https://www.data.boem.gov/Produc-

6    tion/Files/Rank%20File%20Gas%202016.pdf.  Numerous other Defendants conduct, and have for

7    decades conducted, similar oil and gas operations on the federal OCS; indeed, Defendants and their

8    affiliated companies presently hold approximately 32.95% of all outer continental shelf leases.  *See*

9    Bureau of Ocean Energy Management, Lease Owner Information, *available at*

10   https://www.data.boem.gov/Leasing/LeaseOwner/Default.aspx.  For example, certain BP companies

11   and Exxon Mobil currently own lease interests in, and the BP companies operate, "one of the largest

12   deepwater producing fields in the Gulf of Mexico," which is capable of producing up to 250,000 bar-

13   rels of oil per day.  *See* Thunder Horse Field Fact Sheet (last visited Aug. 21, 2017), *available at*

14   http://www.bp.com/content/dam/bp-country/en_us/PDF/Thunder_Horse_Fact_Sheet_6_14_2013.pdf.

15   And as noted on the BP website, production from this and other OCS activities will continue into the

16   future.  *Id.* ("BP intends to sustain its leading position as an active participant in all facets of the

17   Deepwater US Gulf of Mexico—as an explorer, developer, and operator.").  A substantial portion of

18   the national consumption of fossil fuel products stems from production on federal lands, as approved

19   by Congress and Executive Branch decision-makers.

20        53.    The Complaint itself makes clear that a substantial part of Plaintiff's claims "'arise[]

21   out of, or in connection with," Defendants' "operation[s] 'conducted on the outer Continental Shelf"

22   that involve "the exploration and production of minerals."  *In re Deepwater Horizon*, 745 F.3d at

23   163.  Plaintiff, in fact, challenges *all of* Defendants' "extraction . . . of coal, oil, and natural gas" ac-

24   tivities, *e.g.*, Compl. ¶¶ 3, 21, a substantial quantum of which arise from outer continental shelf oper-

25   ations, *see* Ranking Operator by Oil, Bureau of Ocean Energy Mgmt., *available at*

26   https://www.data.boem.gov/Main/HtmlPage.aspx?page=rankOil (documenting Chevron's oil and

27   natural gas production on the federal outer continental shelf from 1947 to 2017).  Plaintiff alleges that

28   emissions have risen due to increased outer continental shelf extraction technologies.  *See, e.g.*,

Compl. ¶¶ 175–76 (discussing arctic offshore drilling equipment and patents which may be relevant to conduct near Alaskan outer continental shelf).  And Plaintiff challenges energy projects that occurred in Canadian waters.  Compl. ¶¶ 141, 143.  Defendants conduct similar activity in American waters and many of the emissions Plaintiff challenges necessarily arise from the use of fossil fuels extracted from the OCS.

54. The relief sought also arises out of and impacts OCS extraction and development. *See, e.g.*, Compl., Prayer for Relief (seeking damages designed to cripple the energy industry and equitable relief that would no doubt rein in extraction, including that on the OCS).  And "any dispute that alters the progress of production activities on the OCS threatens to impair the total recovery of the federally-owned minerals from the reservoir or reservoirs underlying the OCS.  Congress intended such a dispute to be within the grant of federal jurisdiction contained in § 1349." *Amoco Prod. Co.*, 844 F.2d at 1211.

## VII. THE ACTION IS REMOVABLE UNDER THE FEDERAL OFFICER REMOVAL STATUTE

55. The Federal Officer Removal statute allows removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).  "A party seeking removal under section 1442 must demonstrate that (a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'" *Durham*, 445 F.3d at 1251 (citations omitted).  All three elements are satisfied here for the Chevron Parties and many other Defendants, which have engaged in activities pursuant to the directions of federal officers that, assuming the truth of Plaintiff's allegations, have a causal nexus to Plaintiff's claims, and which have colorable federal defenses to Plaintiff's claims, including, for example, performing pursuant to government mandates and contracts, performing functions for the U.S. military, and engaging in activities on federal lands pursuant to federal leases.

56.     First, Defendants are "persons" within the meaning of the statute.  The Complaint al-
leges that Defendants are corporations (Compl. ¶ 23), which the Ninth Circuit has held qualify as
"person[s]" under the statute.  *See Leite*, 749 F.3d at 1122 n.4.

57.     Second, assuming the truth of Plaintiff's allegations, there is a causal nexus between
Defendants' alleged actions, taken pursuant to a federal officer's direction, and Plaintiff's claims.  In
*Leite*, the Ninth Circuit held removal proper where a military contractor, which was sued for failing
to warn about asbestos in military equipment, showed extensive evidence of federal control over its
activities.  This included "detailed specifications governing the form and content of all warnings that
equipment manufacturers were required to provide," which the Navy was directly involved in prepar-
ing and which could not be altered.  749 F.3d at 1123.  Here, Plaintiff's causation and damages alle-
gations depend on the activities of Defendants over the past decades—many of which were under-
taken at the direction of, and under close supervision and control by, federal officials.

58.     To take only one example, the Chevron Parties and other Defendants have long ex-
plored for and produced minerals, oil, and gas on federal lands pursuant to leases governed by the
Outer Continental Shelf Lands Act as described above.  *E.g.*, Thomson Decl., Exs. B, C.  In doing so,
those Defendants were "'acting under' a federal 'official'" within the meaning of Section 1442(a)(1).
*Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 153 (2007).  Under OCSLA, the Interior Depart-
ment is charged with "manag[ing] access to, and . . . receiv[ing] a fair return for, the energy and min-
eral resources of the Outer Continental Shelf."  Statement of Walter Cruickshank, Deputy Director,
Bureau of Ocean Energy Management, Before The Committee On Natural Resources, July, 6, 2016,
*available at* https://www.boem.gov/Congressional-Testimony-Cruickshank-07062016/.  To fulfill
this statutory obligation, the Interior officials maintain and administer the OCS leasing program, un-
der which parties such as Defendants are required to conduct exploration, development and produc-
tion activities that, "in the absence of a contract with a private firm, the Government itself would
have had to perform."  *Watson*, 551 U.S. at 154.

59.     OCS leases obligate lessees like Defendants to "develop[] . . . the leased area" dili-
gently, including carrying out exploration, development and production activities approved by Inte-

1  rior Department officials for the express purpose of "maximiz[ing] the ultimate recovery of hydrocar-

2  bons from the leased area." Ex. C § 10.  Indeed, for decades Defendants' OCSLA leases have in-

3  structed that "[t]he Lessee *shall comply* with all applicable regulations, orders, written instructions,

4  and the terms and conditions set forth in this lease" and that "[a]fter due notice in writing, the Lessee

5  *shall conduct* such OCS mining activities at such rates as the Lessor may require in order that the

6  Leased Area or any part thereof may be properly and timely developed and produced in accordance

7  with sound operating principles." Ex. B § 10 (emphasis added).  All drilling takes place "in accord-

8  ance with an approved exploration plan (EP), development and production plan (DPP) or develop-

9  ment operations coordination document (DOCD) [as well as] approval conditions"—all of which

10  must undergo extensive review and approval by federal authorities, and all of which further had to

11  conform to "diligence" and "sound conservation practices." Ex. C §§ 9, 10.  Federal officers further

12  have reserved the rights to control the rates of mining (Ex. B § 10) and to obtain "prompt access" to

13  facilities and records (Ex. B § 11, Ex. C § 12).  The government also maintains certain controls over

14  how the leased oil/gas/minerals are disposed of once they are removed from the ground, as by pre-

15  conditioning the lease on a right of first refusal to purchase all materials "[i]n time of war or when the

16  President of the United States shall so prescribe" (Ex. B  § 14, Ex. C § 15(d)), and mandating that

17  20% of all crude and natural gas produced pursuant to drilling leases be offered "to small or inde-

18  pendent refiners" (Ex. C § 15(c)).  The Federal Treasury has reaped enormous financial benefits from

19  those policy decisions in the form of statutory and regulatory royalty regimes that have resulted in

20  billions of dollars of revenue to the Federal Government.

21        60.     Certain Defendants have also engaged in the exploration and production of fossil fuels

22  pursuant to agreements with federal agencies.  For example, in June 1944, the Standard Oil Company

23  (a Chevron predecessor) and the U.S. Navy entered into a contract "to govern the joint operation and

24  production of the oil and gas deposits . . . of the Elk Hills Reserve," a strategic petroleum reserve

25  maintained by the Navy.  *Chevron U.S.A., Inc. v. United States*, 116 Fed. Cl. 202, 205 (Fed. Cl.

26  2014).  "The Elk Hills Naval Petroleum Reserve (NPR-1) . . . was originally established in 1912 to

27  provide a source of liquid fuels for the armed forces during national emergencies."  GAO Fact Sheet,

28  Naval Petroleum Reserves – Oil Sales Procedures and Prices at Elk Hills, April Through December

1986 (Jan. 1987) ("GAO Fact Sheet"), *available at* http://www.gao.gov/assets/90/87497.pdf.  In response to the OPEC oil embargo in 1973–74, the Naval Petroleum Reserves Production Act of 1976 (Public Law 94-258, April 5, 1976) was enacted, which "authorized and directed that NPR-1 be produced at the maximum efficient rate for 6 years." *Id.*  In 1977, Congress "transferred the Navy's interests and management obligations to [the Department of Energy]," and Chevron continued its interest in the joint operation until 1997.  *Id.*  That contract governing Standard's rights show the federal government's "full and absolute" power and "complete control" over fossil fuel exploration, production, and sales at the reserve:

- The plan was designed to "[a]fford [the] Navy a means of acquiring *complete control over* the development of the entire Reserve *and the production of oil therefrom*." Ex. D, Recitals § 6(d)(i) (emphases added).

- "[The] Navy shall, subject to the provisions hereof, have the exclusive control over the exploration, prospecting development and operation of the Reserve[.]" Ex. D § 3(a).

- "[The] Navy shall have *full and absolute power* to determine from time to time the rate of prospecting and development on, and the quantity and rate of production from, the Reserve, and may from time to time shut in wells on the Reserve if it so desires." Ex. D § 4(a) (emphasis added).

- "[A]ll exploration, prospecting, development, and producing operations on the Reserve" occurred "under the supervision and direction of an Operating Committee" tasked with "supervis[ing]" operations and "requir[ing] the use of sound oil field engineering practices designed to achieve the maximum economic recovery of oil from the reserve." Ex. D § 3(b).  In the event of disagreement, "such matter shall be referred to the Secretary of the Navy for determination; and his decision in each such instance shall be final and binding upon Navy and Standard." Ex. D § 9(a).

- The Navy retained ultimate and even "absolute" discretion to suspend production, decrease the minimum amount of production per day that Standard was entitled to receive, or increase the rate of production.  Ex. D §§ 4(b), 5(d)(1).

The contract demonstrates that Defendants' activities under federal officers went far beyond simple compliance with the law or participation in a regulated industry

61.    Defendants also have supplied motor vehicle fuels under agreements with the federal government, including the Armed Forces.  For instance, CITGO Petroleum Corporation ("CITGO") was a party to fuel supply agreements with the Navy Exchange Service Command ("NEXCOM"), which is a department of the Naval Supply Systems Command of the U.S. Navy.  Among other

NOTICE OF REMOVAL

things, NEXCOM sells goods and services at a savings to active duty military, retirees, reservists, and their families.  Starting in approximately 1988 through approximately 2012, pursuant to its agreements with NEXCOM, CITGO supplied CITGO branded gasoline and diesel fuel to NEXCOM for service stations operated by NEXCOM on Navy bases located in a number of states across the country.  The NEXCOM agreements contained detailed fuel specifications, and CITGO complied with these government specifications in supplying the fuel to NEXCOM.  CITGO also contracted with NEXCOM to provide demolition, site preparation, design, construction, and related financing services to build new gasoline service stations on Navy bases in the 1990s.

62.     As discussed above, these and other federal activities are encompassed in Plaintiff's Complaint.  *See supra* ¶¶ 48–61.  Plaintiff alleges that the drilling and mining operations Defendants performed led to the sale of fossil fuels—including to the Federal Government—which led to the release of greenhouse gases by end-users—including to the Federal Government.  Furthermore, the oil and gas Defendants extracted—which the Federal Government (i) reserved the right to buy in total in the event of a time of war or whenever the President so prescribed and (ii) has purchased from Defendants to fuel its military operations—is the very same oil and gas that Plaintiff alleges is a "defective" product giving rise to strict liability.  Accordingly, Plaintiff seeks to hold Defendants liable for the very activities Defendants performed under the control of a federal official, and thus the nexus element has been satisfied.

63.     Third, Defendants intend to raise numerous meritorious federal defenses, including preemption, *see Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1249–50 (9th Cir. 2017), the government contractor defense, *see Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988); *Gertz v. Boeing*, 654 F.3d 852 (9th Cir. 2011), and others.  In addition, Plaintiff's claims are barred by the United States Constitution, including the Commerce and Due Process clauses, as well as the First Amendment and the foreign affairs doctrine.  These and other federal defenses are more than colorable.  *See Willingham v. Morgan*, 395 U.S. 402, 407 (1969) (a defendant invoking section 1442(a)(1) "need not win his case before he can have it removed").  Accordingly, removal under Section 1442 is proper.

1  **VIII.  THE ACTION IS REMOVABLE BECAUSE THIS CASE ARISES FROM ACTS**
2  **ARISING FROM MULTIPLE FEDERAL ENCLAVES**

3          64.     This Court also has original jurisdiction under the federal enclave doctrine.  The Con-

4  stitution authorizes Congress to "exercise exclusive legislation in all cases whatsoever" over all

5  places purchased with the consent of a state "for the erection of forts, magazines, arsenals, dock-

6  yards, and other needful buildings."  U.S. Const., art. I, § 8, cl. 17.  "Federal courts have federal ques-

7  tion jurisdiction over tort claims that arise on 'federal enclaves.'"  *Durham*, 445 F.3d at 1250; *see*

8  *also Totah v. Bies*, No. C 10-05956 CW, 2011 WL 1324471, at *2 (N.D. Cal. Apr. 6, 2011) (denying

9  motion to remand where defamation claim arose in the Presidio in San Francisco, a federal enclave).

10  The "key factor" in determining whether a federal court has federal enclave jurisdiction "is the loca-

11  tion of the plaintiff's injury or where the specific cause of action arose."  *Sparling v. Doyle*, 2014 WL

12  2448926, at *3 (W.D. Tex. May 30, 2014); *see also Fung v. Abex Corp.*, 816 F. Supp. 569, 571 (N.D.

13  Cal. 1992) ("Failure to indicate the federal enclave status and location of the exposure will not shield

14  plaintiffs from the consequences of this federal enclave status."); *Bd. of Comm'rs of Se. La. Flood*

15  *Protection Auth.-E. v. Tenn. Gas Pipeline Co.*, *LLC*, 29 F. Supp. 3d 808, 831 (E.D. La. 2014) (noting

16  that defendants' "conduct" or "the damage complained of" must occur on a federal enclave).  Federal

17  jurisdiction is available if some of the events or damages alleged in the complaint occurred on a fed-

18  eral enclave.  *See Durham*, 445 F.3d at 1250; *Bell v. Arvin Meritor, Inc.*, No. 12-00131-SC, 2012 WL

19  1110001, at *2 (N.D. Cal. Apr. 2, 2012) (finding federal enclave jurisdiction where "some of the[]

20  locations … are federal enclaves"); *Totah*, 2011 WL 1324471, at *2 (holding that court can "exercise

21  supplemental jurisdiction over related claims" that did not arise on federal enclave).

22          65.     Three requirements exist for land to be a federal enclave:  (1) the United States must

23  have acquired the land from a state; (2) the state legislature must have consented to the jurisdiction of

24  the Federal Government; and (3) the United States must have accepted jurisdiction.  *Wood v. Am.*

25  *Crescent Elevator Corp.*, No. 11-397, 2011 WL 1870218, at *2 (E.D. La. May 16, 2011).

26          66.     Upon information and belief, the federal government owns federal enclaves in the area

27  at issue where Plaintiff's "damage complained of" allegedly occurs.  *Tenn. Gas Pipeline*, 29 F. Supp.

28  3d at 831.  Indeed, Plaintiff broadly alleges injuries to huge swaths of the City, *see* Compl. ¶¶ 201–

03, and "[f]ailure to indicate the federal enclave status and location of the exposure will not shield plaintiffs from the consequences of this federal enclave status," *Fung*, 816 F. Supp. at 571.

67. On information and belief, Defendants maintain or maintained oil and gas operations on military bases or other federal enclaves such that the Complaint, which bases the claims on the "extracting, refining, processing, producing, promoting and[/or] marketing of fossil fuel products" (Compl. ¶ 21), arises under federal law. *See, e.g.*, *Humble Pipe Line Co. v. Waggoner*, 376 U.S. 369, 372 (1964) (noting that the United States exercises exclusive jurisdiction over oil and gas rights within Barksdale Air Force Base in Louisiana); *see also Mississippi River Fuel Corp. v. Cocreham*, 390 F.2d 34, 35 (5th Cir. 1968) (on Barksdale AFB, "the reduction of fugitive oil and gas to possession and ownership[] takes place within the exclusive jurisdiction of the United States"). Indeed, as of 2000, approximately 14% of the National Wildlife Refuge System "had oil or gas activities on their land," and these activities were spread across 22 different states. *See* GAO, *U.S. Fish and Wildlife Service: Information on Oil and Gas Activities in the National Wildlife Refuge* (Oct. 30, 2001), *available at* http://www.gao.gov/new.items/d0264r.pdf. Furthermore, Chevron and its predecessor companies for many years engaged in production activities on the Elk Hills Reserve—a strategic oil reserve maintained by the Naval Department—pursuant to a joint operating agreement with the Navy. *See Chevron U.S.A.*, 116 Fed. Cl. at 205. Pursuant to that agreement, Standard Oil "operat[ed] the lands of Navy and Standard in the Reserve." Ex. D at 4.

68. In addition, the Complaint relies upon conduct occurring in the District of Columbia— itself a federal enclave, *see, e.g.*, *Collier v. District of Columbia*, 46 F. Supp. 3d 6 (D.D.C. 2014); *Hobson v. Hansen*, 265 F. Supp. 902, 930 (D.D.C. 1967)—as a basis for Plaintiff's claims. Indeed, Plaintiff complains that Defendants' supposedly wrongful conduct included their memberships in various "trade association[s]," and providing funding to "think tanks," which allegedly had the effect of "evad[ing] regulation" of fossil fuel products by "deceiv[ing]" policymakers about the role of fossil fuel products in causing global warming. Compl. ¶¶ 169–70, 173. The Complaint also points to Defendants' purported funding of "lobbyist[s]" to influence legislation and legislative priorities. Here, too, "some of the[] locations" giving rise to Plaintiff's claims "are federal enclaves," further

Gibson, Dunn & Crutcher LLP

underscoring the presence of federal jurisdiction. *Bell*, 2012 WL 1110001, at *2. As the Ninth Circuit contemplated in *Jacobson v. U.S. Postal Serv.*, 993 F.2d 649, 657 (9th Cir. 1992), free speech placed at issue in a federal enclave falls under the jurisdiction of the federal courts. *Id.* (observing that newspaper vendors were required to obtain permits pursuant to a federal statute to sell newspapers in front of U.S. post office locations, which the Court deemed to be "within the federal enclave"). Because Plaintiff claims that Defendants' speech within the federal enclave of the District of Columbia was, among other alleged causes, the basis of its injury, this Court is the only forum suited to adjudicate the merits of this dispute.

## IX.  THE ACTION IS REMOVABLE UNDER THE BANKRUPTCY REMOVAL STATUTE

69.  The Bankruptcy Removal Statute allows removal of "any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title." 28 U.S.C. § 1452(a). Section 1334, in turn, provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings, arising under Title 11, or arising in or related to cases under title 11" of the United States Code. 28 U.S.C. § 1334(b). The Ninth Circuit has emphasized that "'related to' jurisdiction is very broad, including nearly every matter directly or indirectly related to the bankruptcy." *Sasson v. Sokoloff* (*In re Sasson*), 424 F.3d 864, 868 (9th Cir. 2005). An action is thus "related to" a bankruptcy case if it "'could conceivably have any effect on the estate being administered in bankruptcy.'" *PDG Arcos, LLC*, 436 F. App'x at 742 (quoting *In re Feitz*, 852 F.2d 455, 457 (9th Cir. 1988)). Where a Chapter 11 plan has been confirmed, there must be a "close nexus" between the post-confirmation case and the bankruptcy plan for related-to jurisdiction to exist. *In re Pegasus Gold Corp.*, 394 F.3d 1189, 1194 (9th Cir. 2005) (citing *In re Resorts Int'l, Inc.*, 372 F.3d 154, 166–67 (3d Cir. 2004)). "[A] close nexus exists between a post-confirmation matter and a closed bankruptcy proceeding sufficient to support jurisdiction when the matter 'affect[s] the interpretation, implementation, consummation,

Gibson, Dunn &
Crutcher LLP

1    execution, or administration of the confirmed plan.'" *In re Wilshire Courtyard*, 729 F.3d 1279, 1289

2    (9th Cir. 2013) (quoting *Pegasus Gold*, 394 F.3d at 1194).

3           70.    Plaintiff's claims are purportedly predicated on historical activities of Defendants, in-

4    cluding predecessor companies, subsidiaries, and companies that Defendants may have acquired or

5    with which they may have merged, as well as numerous unnamed but now bankrupt entities.  Indeed,

6    Plaintiff explicitly premises its theories of liability on the actions of Defendants' subsidiaries.  *See,*

7    *e.g.*, Compl ¶¶ 235, 248.[4]  Because there are hundreds of non-joined necessary and indispensable par-

8    ties, there are many other Title 11 cases that may be related.  Indeed, the related climate-change cases

9    that Plaintiff's counsel recently filed on behalf of other cities and counties already generated bank-

10   ruptcy court proceedings.  *See, e.g.*, *In re Peabody Energy Corp.*, 2017 WL 4843724, Case No. 16-

11   42529 (Bankr. E.D. Mo. Oct.24, 2017) (holding that the plaintiffs' state-law claims were discharged

12   when Peabody emerged from bankruptcy in March 2017); *In re Arch Coal, Inc.*, Case No. 16-40120,

13   Dkt. 1615 (Bankr. E.D. Mo. Nov. 21 2017) (stipulation providing that any action in the Peabody

14   bankruptcy proceedings that results in dismissal of any of the plaintiffs' claims against Peabody will

15   require dismissal of claims against Arch).  Accordingly, Plaintiff's broad claim has the required

16   "close nexus" with Chapter 11 plans to support federal jurisdiction.  *Wilshire Courtyard*, 729 F.3d at

17   1289; *see also In re Dow Corning Corp.*, 86 F.3d 482, 493–94 (6th Cir. 1996).

18          71.    As just one example of how Plaintiff's historical allegations have created a "close

19   nexus" with a Chapter 11 plan, one of Chevron's current subsidiaries, Texaco Inc., filed for bank-

20   ruptcy in 1987.  *In re Texaco Inc.*, Case No. 87-20142 (Bankr. S.D.N.Y. 1987).  The Chapter 11 plan,

21   which was confirmed in 1988, bars certain claims against Texaco arising prior to March 15, 1988.  *Id.*

22   Dkt. 1743.[5]  Plaintiff's Complaint alleges that Texaco, as well as unnamed Chevron "predecessors"

23   and "subsidiaries," engaged in culpable conduct prior to March 15, 1988, and it attributes this con-

24   duct to defendant "Chevron."  *See* Compl. ¶¶ 21–23.  Plaintiff's claim against Chevron thus is at least

---

[4] To the extent Plaintiff seeks to hold Defendants liable for the conduct of their subsidiaries, affili-
ates or other related entities, such attempts are improper.  *See, e.g., Gustavson v. Wrigley Sales
Co.*, 961 F. Supp. 2d 1100, 1132 (N.D. Cal. 2013) (holding that "parent-subsidiary relation-
ship . . . is an insufficient basis, standing alone, for holding [parent] liable for [subsidiary's] con-
duct").

[5] There are pending motions to reopen Texaco's bankruptcy case, which motions are being actively
litigated in the Bankruptcy Court.  *See id*. Dkt. 3923.

partially barred by Texaco's confirmed Chapter 11 plan to the extent that the claims relate to Texaco's conduct prior to 1988.  Accordingly, even though Texaco's Chapter 11 plan has been confirmed and consummated, Plaintiff's claim has a "close nexus" to the plan to support federal jurisdiction. *See Wilshire Courtyard*, 729 F.3d at 1292–93 (federal court had "'related to' subject matter jurisdiction under the *Pegasus Gold* test despite the fact that the Plan transactions have been long since consummated").

72.     Finally, Plaintiff's action is primarily one to protect its "pecuniary interest."  *City & Cnty. of San Francisco v. PG&E Corp.*, 433 F.3d 1115, 1124 (9th Cir. 2006).  As demonstrated by Plaintiff's request for substantial amounts of compensatory damages, "punitive and exemplary damages," and "equitable disgorgement of all profits Defendants obtained through their" alleged conduct (*see, e.g.*, Compl. ¶¶ 265, 275, 285, 294, Prayer for Relief), this action is primarily pecuniary in nature.  *See also id.* ¶¶ 203 (alleging that "sea level rise-related and hydrologic cycle change-related impacts . . . have caused and will continue to cause injuries to the City . . . that cause the City to expend resources in responding to these impacts [and] lose revenue due to decreased economic activity"), 203 (g) (describing "substantial response costs for the City" in connection with flooding), 203(i) (describing "costly repairs" that will be necessary to fix "[f]lood damage" to City park infrastructure), 203(k) (noting that the City "has expended resources in planning for upgrades to its water storage and delivery facilities"), 204 (alleging that "[t]he City is planning, at significant expense, adaption strategies to address sea level rise and related impacts").  These allegations make clear that Plaintiff's action is primarily brought fill the City's coffers by reaping a financial windfall.  *See PG&E Corp.*, 433 F.3d at 1125 n.11.

## X.     THIS COURT HAS JURISDICTION AND REMOVAL IS PROPER

73.     Based on the foregoing allegations from the Complaint, this Court has original jurisdiction over this action under 28 U.S.C. § 1331.  Accordingly, removal of this action is proper under 28 U.S.C. §§ 1334, 1441, 1442, 1452, and 1446, as well as 43 U.S.C. § 1349(b).

74.     The United States District Court for the Northern District of California is the appropriate venue for removal pursuant to 28 U.S.C. § 1441(a) because it embraces the place where Plaintiff originally filed this case, in the Superior Court of California for the County of Contra Costa.  *See*

28 U.S.C. § 84(a); 28 U.S.C. § 1441(a).  Pursuant to Local Rule 3-2(d), the action should be assigned to either the San Francisco or Oakland divisions of this Court.

75.     No Defendants have been served (properly or otherwise) in this action, *see* Thomson Decl., ¶ 4, and there is no requirement that any party not properly joined and served consent.  *See City of Ann Arbor Employees' Ret. Sys. v. Gecht*, No. C-06-7453EMC, 2007 WL 760568, at *8 (N.D. Cal. Mar. 9, 2007); 28 U.S.C. § 1446(b)(2)(A) (requiring consent only from "all defendants who have been properly joined and served").[6]  Pursuant to 28 U.S.C. § 1446(a), a copy of all process, pleadings, and orders in the possession of the Chevron Parties is attached as Exhibit A to the Thomson Declaration.

76.     Upon filing this Notice of Removal, Defendants will furnish written notice to Plaintiff's counsel, and will file and serve a copy of this Notice with the Clerk of the Superior Court of California for the County of Contra Costa, pursuant to 28 U.S.C. § 1446(d).

Accordingly, Defendants remove to this Court the above action pending against them in the Superior Court of California for the County of Contra Costa.

Respectfully submitted,

Dated:  February 2, 2018                         GIBSON, DUNN & CRUTCHER LLP


                                                 By:    */s/ Theodore J. Boutrous, Jr.*
                                                        Theodore J. Boutrous, Jr.

                                                 *Attorneys for Defendants Chevron Corporation and Chevron U.S.A., Inc.*

---

[6]  In addition, bankruptcy removal under 28 U.S.C. § 1452 and federal officer removal "represent[] an exception to the general rule . . . that all defendants must join in the removal petition." *Ely Valley Mines, Inc. v. Hartford Accident & Indem. Co.*, 644 F.2d 1310, 1315 (9th Cir. 1981).